IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MELINDA A. GOODE,
Plaintiff,

       v.

AMERICAN VETERANS, INC., *et al.*,
Defendants.

\* \* \* \* \* \*

Civil No. 8:11-cv-02414

\*\*\*\*\*\*

<u>MEMORANDUM</u>

    Melinda Goode ("Goode") filed a nine-count complaint in this court on August 29, 2011

against defendants American Veterans, Inc. ("AMVETS"), her former employer, and Velma R.

Hart ("Hart") and Linda A. Tucker ("Tucker"), two former AMVETS employees, alleging

abusive discharge (Count I); breach of express and implied agreement, breach of the employee

policy manual and promissory estoppel (Count II); Employee Retirement Income Security Act

("ERISA") violations (Count III); Fair Labor Standards Act ("FLSA") violations (Count IV);

tortious interference with business, economic, and contractual relations (Count V); civil

conspiracy (Count VI); negligent misrepresentation (Count VII), intentional misrepresentation

and fraud (Count VIII); and intentional/negligent infliction of emotional distress (Count IX).[1]

All counts, except Count V, are directed against defendant AMVETS.  Counts V and VI are

asserted against defendants Hart and Tucker.

    Now pending before the court are defendants' motions to dismiss pursuant to Federal

Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment pursuant to

Federal Rule of Civil Procedure 56(c).  (ECF Nos. 16 (Tucker), 17 (AMVETS), 18 (Hart).)  In

---

[1] Goode has withdrawn her claim for emotional distress (Count IX).  (Goode Opp'n. ¶ 9, ECF
No. 23.)

addition, Goode has filed a Rule 56(d) motion to permit discovery and hold defendants'

summary judgment motions in abeyance.  (ECF No. 27.)  The issues have been fully briefed, and

no oral argument is necessary.  *See* Local Rule 105.6.   For the reasons stated below (1) Goode's

Rule 56(d) motion is denied; (2) defendants' motions to dismiss are granted as to Counts IV (in

part),V, and VI ; (3) defendants' motions for summary judgment are granted as to Counts II, III,

VII, and VIII; and (4) defendants' motions are denied with respect to Counts I and IV (in part).

## I. BACKGROUND[2]

Melinda A. Goode ("Goode" or "plaintiff") worked as a meeting planner for American

Veterans, Inc. ("AMVETS") from September 8, 2008 until her discharge on August 27, 2009.

(Compl. ¶¶ 2–3.)  AMVETS is non-profit, 501(c)(19) tax-exempt organization.  (*Id.* ¶ 6.)  It is

the fourth-largest veterans organization in the United States and is open to all servicepersons

who have honorably served or presently serve in the U.S. Armed Forces.  (*Id.* ¶ 25.)  The day-to-

day functions of the organization are performed by a national staff, which is headed by several

directors.  (*Id.* ¶¶ 28–29.)  During Goode's tenure as AMVETS's meeting planner, James B.

King ("King") served as AMVETS's National Executive Director, (*id.* ¶ 30), and Velma R. Hart

("Hart") served as the organization's National Finance Director.  (*Id.* ¶ 7.)

Goode first became aware of the meeting planner position in August 2008 after seeing an

advertisement AMVETS placed in a local newspaper.  (*Id.* ¶ 36.)  Goode responded to the ad

with a resume and cover letter stressing the importance of the long-term nature of the advertised

position.  (*Id.* ¶ 37.)  Her cover letter stated, "Having recently closed my shop, I am seeking a

---

[2] The facts are taken almost exclusively from the complaint.  For those counts dismissed on
summary judgment, I look to supplemental materials when necessary.  For the purpose of
addressing defendants' motions, I take as true all of plaintiff's allegations of material fact and
construe them in the light most favorable to the plaintiff.  *E.I. du Pont de Nemours & Co. v.
Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

long-term, permanent position which will utilize my experience and skills as a meeting planner."
(*Id*.)  That same month, on August 29, 2008, Goode interviewed for the position with King,
AMVETS's Executive Director, and Maria Isaja ("Isaja"), AMVETS's Human Resources
Director.  (Compl. ¶ 38.)  Goode avers that when she asked why the position was vacant, King
explained that each former meeting planner "had simply moved on."  (*Id*.)  Goode states that
when she pushed for more details as to why there had been three meeting planners in the span of
three years, King responded that it was due to normal attrition and that AMVETS actually had
little turnover, a product of the organization's good team environment.  (*Id*. ¶ 40.)  According to
Goode, King maintained there were no personality clashes or other issues that in any way
hastened previous meeting planners' departures.  (*Id*. ¶ 44.)  Goode asserts that throughout the
interview she stressed the importance of job stability and specifically advised King and Isaja that
she was looking for a long-term, permanent position—effectively her "last job."  (*Id*. ¶ 42.)  To
further explain why stability was so important to her, Goode told King and Isaja that she recently
closed her business and for financial reasons anticipated working beyond retirement age.  (*Id*.)

Goode was informed prior to the interview that the position paid "in the mid-to-high
thirties."  (*Id*. ¶ 38.)  During the interview, Goode asked for a starting salary closer to $48,000.
(*Id*. ¶ 49.)  King agreed to increase the position's salary to Goode's desired $48,000 after a six-
month probationary period, (*id*. ¶ 49), and Isaja offered an initial salary review after three
months.  (*Id*. ¶ 50.)

On September 2, 2008, Isaja phoned Goode to offer her the meeting planner position at a
starting salary of $38,000, with an initial salary review after three months.  (*Id*. ¶ 51.)  Two days
later, Goode received a signed formal offer letter by e-mail.  (*Id*. ¶ 53.)  The offer letter defined
the meeting planner position as a "full-time exempt position," listed Goode's start date and

salary, and provided for a three-month salary review.  (*Id.* ¶ 54.)  In addition, the letter

summarized her benefits package, including her right to life insurance, a 401(k) defined

contribution plan, vacation and sick days, and long-term disability insurance.  (*Id.* ¶ 55.)  The

letter also made clear that Goode was to abide by AMVETS's employee handbook.  (*Id.* ¶ 57.)

Finally, the letter included the following language:

> Maryland is an "employment at will" state.  This means that either you or
> AMVETS may, at your or our discretion, terminate our employment
> relationship at any time.   Completion of the designated probationary
> period does not change your status as an at-will employee or in any way
> restrict AMVETS' right to terminate you or change the terms or
> conditions of your employment.  This letter cannot be construed as a
> contract, but as an offer of employment for an indeterminate period of
> time.

(*Id.* ¶ 56.)  Goode alleges that she immediately called Isaja to question her about the "at will"

language.  (*Id.* ¶ 59.)   Isaja's response, Goode states, was to downplay the language and dismiss

it as "legalese" included in the letter to "keep the lawyers happy."  (*Id.* ¶ 59.)  After speaking

with Isaja, Goode signed the offer letter.  (*Id.* ¶ 60.)

Goode began work on September 8, 2008.  (*Id.* ¶ 52.)  Shortly thereafter she received

AMVETS's "employee handbook," referenced in her offer letter.  (*Id.* ¶ 61.)  The handbook

included a thorough discussion of AMVETS policies and procedures, including employee duties

and obligations as well as rights and entitlements.  (*Id.* ¶¶ 62, 65.)  The handbook also defined

itself as "only a general guide" and said it was "not intended to be, and should not be, construed

as a contract."  (*Id.* ¶ 63; Compl. Ex. A. at 48, ECF No. 1-1.)  Furthermore, the handbook

reiterated that AMVETS was an at will employer and explained that "the employment-at-will

doctrine . . . part of the fabric of [Maryland's] non-statutory or 'common law' . . . provides that

an employee who does not have a written contract of employment for a specified period of time

can be terminated at any time . . . with or without notice or cause."  (*Id.*)

Over the course of her employment, Goode planned several events.  (*Id*. ¶ 68.)  Goode states she was significantly under budget for all of these events, received praise from AMVETS leadership, and was never the subject of any complaints or negative performance evaluations.  (*Id*. ¶ 69.)  Goode performed successfully despite working under what she alleged amounted to a hostile and intolerable work environment.  (*Id*. ¶ 70.)  Goode states defendant Hart engaged in uncivil and harassing behavior, including threats, invasion of privacy, verbal abuse, public ridicule and belittling, in an attempt to force Goode to quit.  (*Id*. ¶ 84.)  Goode reported to King, pursuant to the employee handbook's reporting procedures, not only Hart's alleged harassment but also suspicions of Hart's inappropriate use of AMVETS's corporate credit card and attempted manipulation of corporate award accounts for Hart's personal benefit.  (*Id*. ¶¶ 75, 76, 78.)

In addition to her grievances related to Hart, Goode questioned King and Isaja about her status as an exempt employee, arguing that she was, in fact, a non-exempt employee and was therefore entitled to overtime wages under Maryland and federal law.  (*Id*. ¶¶ 89–92.)  Unsatisfied with King's response, Goode reported the alleged violation to the United States Depart of Labor ("DOL") on September 17, 2009.  (*Id*. ¶ 94.)

On August 27, 2009, King and Isaja informed Goode that the meeting planner position had been eliminated for budgetary reasons.  (*Id*. ¶ 95.)  Following Goode's discharge, on September 1, 2009, AMVETS entered into a Memorandum of Understanding ("MOU") with Events at Last, an event planning company owned and operated by defendant Linda Tucker ("Tucker"), a former AMVETS employee.  (AMVETS Mem. Supp. Mot. Dismiss or Summ. J. at 5–6, ECF No. 17-1.)  From January 2000 until May 2006, Tucker held the meeting planner position Goode later occupied.  (Compl. ¶ 33.)  Goode alleges Hart discovered the complaints

5

lodged against her and retaliated against Goode by conspiring with Tucker to replace Goode after Hart secured Goode's termination under the cover of a "Reduction in Force."  (*Id*. ¶¶ 80–83, 85–86.)

After her alleged wrongful discharge, Goode filed this action against defendants AMVETS, Hart, and Tucker, raising numerous claims under both federal and Maryland state law.

## II. STANDARDS OF REVIEW

### A.  Motion to Dismiss

"[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (internal quotation marks and alterations omitted) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)).  To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and alterations omitted).  Thus, the plaintiff's obligation is to set forth sufficiently the "grounds of his entitlement to relief," offering "more than labels and conclusions."  *Id*. (internal quotation marks and alterations omitted).  It is not sufficient that the well-pleaded facts suggest "the mere possibility of misconduct."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  Rather, to withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," meaning the court could draw "the reasonable inference that the defendant is liable for the conduct alleged."  *Id*. at 663 (internal quotation and citation omitted).

When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). The court need not, however, "accept the legal conclusions drawn from the facts, and [it] need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).

B.  Summary Judgment

A court may properly award summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). A material fact is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* When reviewing a motion for summary judgment, the court must look at the facts and inferences drawn therefrom in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 373, 378 (2007).

While the burden is on the moving party to demonstrate the absence of any genuine issue of material fact, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), "[a] mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). The non-moving party may not merely rest upon allegations or denials in her pleadings but must, by affidavit or other evidentiary showing, set out specific facts showing a genuine issue remains for trial. Fed. R. Civ. P. 56(e)(2). A court should enter summary

judgment where a nonparty fails to make a sufficient showing to establish the elements essential

to the party's claim and on which the party will bear the burden of proof at trial. *See Celotex*,

477 U.S. at 322. "By its very terms, this standard provides that the mere existence of *some*

alleged factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment; the requirement is that there be no *genuine* issue of *material*

fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2510 (1986). If

there is insufficient evidence for a reasonable jury to render a verdict in favor of the non-moving

party, there is no genuine issue of material fact, and summary judgment may be granted. *See*

*Anderson*, 477 U.S. at 248. The District of Maryland has held that "a party cannot create a

genuine dispute of material fact through mere speculation or compilation of inferences."

Summary judgment is inappropriate, however, if there clearly exist factual issues "that properly

can be resolved only by a finder of fact because they may reasonably be resolved in favor of

either party." *Id.* at 250; *see also JKC Holding Co., LLC v. Washington Sports Ventures, Inc.*,

264 F.3d 459, 465 (4th Cir. 2001).

## III. ANALYSIS

As a preliminary matter, I decline to stay a ruling on defendants' motions in order to

provide Goode an opportunity to conduct discovery. Goode has failed to specify what she is

seeking through discovery and why this information is currently unavailable to her.[3] More

---

[3] Federal Rule of Civil Procedure 56(d) provides: "If a nonmovant shows by affidavit or
declaration that, for specified reasons, it cannot present facts essential to justify its opposition,
the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or
declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).
Goode fails to identify any facts essential to her opposition that are not already available to her
and that she could only obtain through discovery. In fact, Goode begins her Rule 56(d) motion
by stating "her affidavit [submitted with her original opposition] asserts admissible evidence
sufficient to overcome Defendants' motions." (Goode Mot. Hold Summ. J. Abeyance at 2, ECF
No. 27.) It is only in the alternative, if the court finds otherwise, that Goode requests leave to

importantly, I find that there remains a sufficient record to permit a summary judgment determination even if the court disregards the challenged provisions of Goode's affidavit.[4]

The complaint contains eight counts, many of which reference several different statutes or causes of action. All counts, except Count V, are asserted against defendant AMVETS. Only Counts V and VI are asserted against defendants Hart and Tucker. I first dismiss several Counts pursuant to Federal Rule of Civil Procedure 12(b)(6). I then address the surviving Counts on summary judgment. Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment.").

---

conduct discovery. Furthermore, Goode at no point details with any specificity materials she is reasonably likely to obtain through discovery. In her consolidated response, Goode at one point proffers generally that "no doubt additional discovery would reveal communications between Defendants Hart and Tucker." (Goode Opp'n at 48.) The Fourth Circuit has ruled that "[a] nonmovant may not simply rely on vague assertions that additional discovery will produce needed, but unspecified facts." *Finzel v. Mazda Motor of Am., Inc.*, 172 F.3d 43 (Table), 1999 WL 12934, at *2 (4th Cir. 1999); *see also Morrow v. Farell*, 187 F. Supp. 2d 548, 551 (D. Md. 2002) (noting a request for discovery will not be granted if the party seeks to conduct a "fishing expedition" in the hopes of finding helpful evidence). As a final point, Goode's motion is procedurally defective. Goode never filed a formal Rule 56(d) declaration or affidavit. Although Goode has filed two affidavits in response to defendants' motions, she never filed a specific affidavit pursuant to Rule 56(d) that specifies a legitimate need for further discovery and outlines with some particularity what she hopes to obtain through discovery should the motion be granted. *See Jarvis v. Astrue*, No. CCB-05-2950, 2007 WL 2332694, at *9 (D. Md. 2007) (noting the importance of an affidavit laying out "specific and detailed information about the proposed discovery clearly linking it to the elements necessary for an effective opposition."), *aff'd*, 282 F. App'x 259 (4th Cir. 2008). The failure to submit a formal Rule 56(d) affidavit or declaration is, on its own, sufficient grounds for denying Goode's motion to hold summary judgment in abeyance. *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244, 246 n.19 (4th Cir. 2002); *Nguyen v. CAN Corp.*, 44 F.3d 234, 242 (4th Cir. 1995).

[4] Express notice of the conversion (from motion to dismiss to summary judgment) is not needed when defendants' motions to dismiss are alternately framed as motions for summary judgment, providing plaintiff with the opportunity to submit additional materials outside the pleadings. *Jackson v. Mayor of Baltimore City*, No. JFM 08-3103, 2009 WL 2060073, at * 1 (D. Md. July 14, 2009).

A.  **Motion to Dismiss**

   i.  *Abusive Discharge—Violation of Public Policy (Count I)*

"The common law rule, applicable in Maryland, is that an employment contract of indefinite duration, that is, at will, can be legally terminated at the pleasure of either party at any time."  *Adler v. Am. Standard Corp.*, 432 A.2d 464, 467 (Md. 1981) (citing, among other cases, *State Comm'n on Human Relations v. Amecom Div.*, 360 A.2d 1 (Md. 1976)).  However, in *Adler*, on a certified question from the District of Maryland, the Maryland Court of Appeals recognized a narrow exception to the common law terminable at-will doctrine; a cause of action is allowed for abusive discharge of an at-will employee if the motivation for the discharge "contravened some clear mandate of public policy."  432 A.2d at 471.

The tort of abusive discharge is one of limited scope.  A tort action for abusive discharge lies in only two situations: (1) discharge for refusing to engage in an illegal activity and (2) discharge for exercising a specific legal right or duty.  *Adler v. Am. Standard Corp.*, 830 F.2d 1303, 1307 (4th Cir. 1987); *see also Milton v. IIT Research Inst.*, 138 F.3d 519, 522 (4th Cir. 1998) (affirming dismissal of an abusive discharge claim that did not fit into either category).  Furthermore, "[a]busive discharge is inherently limited to remedying only those discharged in violation of a clear mandate of public policy *which otherwise would not be vindicated by a civil remedy*."  *Makovi v. Sherwin-Williams Co.*, 561 A.2d 179, 180 (Md. 1989) (emphasis added).  Thus, a statute that carries its own remedy cannot satisfy the public policy exception because "the generally accepted reason for recognizing the tort [of abusive discharge], that of vindicating an otherwise civilly unremedied public policy violation, does not apply."  *Id*. at 190.  Under the facts of this case, Goode must assert with particularity and specificity a clear mandate of public policy, the source of which is not a statute providing its own remedy, and which bestows on her a

particular legal duty.  Goode fails to do so, and therefore her claim for abusive discharge must be

dismissed.

Goode's complaint includes a laundry list[5] of public policy sources and, as one District of

Maryland judge aptly phrased, asks this court to "'pluck out' a public policy from a potential

pool of mandates."  *Thompson v. Mem'l Hosp. at Easton, Md.*, 925 F. Supp. 400, 407 (D. Md.

1996) (Harvey, J.).  However, there are significant problems with each proffered public policy

source.  First, the litany of statutes to which Goode points as potential public policy sources all

include their own enforcement provisions and therefore cannot serve as the basis of a separate

tort cause of action for abusive discharge under the principle established in *Makovi*.[6]  561 A.2d at

180.  Second, Goode seems to suggest that even if her discharge was not specifically prohibited

by statute, this court should recognize a more general public policy exception to the terminable at

---

[5] Goode fails to discuss or explain the relevance of the majority of the public policy sources she lists.  For example, she includes the Equal Pay Act and Maryland's Occupational Safety and Health laws in her list of statutes without alleging a single occurrence of gender-based discrimination or violations of workplace health and safety laws.  The exhaustive list of public policy sources, many of which seem completely disconnected to the facts of the case, raises suspicions about the validity of her abusive discharge claim.  *Thompson*, 925 F. Supp. at 407 ("The claims asserted by plaintiff in this case are particularly suspect because he has advanced the existence of so many different public policies allegedly violated by defendant in terminating his employment.").

[6] For example, Goode points to the Maryland Code's prohibition on discriminatory employment practices based on an employee's race, color, religion, sex, age, national origin, marital status, sexual orientation, genetic information, or disability, Md. Code Ann., State Gov't § 20-602, and to the Code's prohibition on discharging an employee in retaliation for exercising a right under Maryland's occupational safety and health laws, Md. Code Ann., Lab. & Empl. § 5-604, or in retaliation for trying to enforce equal pay laws.  Md. Code Ann., Lab & Empl. § 3-308.  Each of these statutes provides administrative or judicial remedies, and therefore the policies underlying these statutes cannot form the basis of an abusive discharge claim.  *See* Md. Code. Ann., State Gov't § 20-1213; Md. Code Ann., Lab. & Empl. § 5-604(b); Md. Code Ann., Lab. & Empl. § 3-427(a).  Even if these statutes could form the basis of a "clear mandate of public policy" required for an abusive discharge cause of action, Goode fails to provide sufficient factual support to overcome dismissal.  In fact, Goode's listing of these statutes is the only place in the more than fifty-page complaint where she mentions status-based discrimination, occupational safety and health violations, and the other protections afforded by the statutes she proffers as public policy sources.

will doctrine.  However, the general public policies she proffers, such as encouraging reporting

of potential illegal conduct, (Compl. ¶ 104), and protecting against retaliation for

whistleblowing, (Compl. ¶ 115), are too general and unspecified to establish a public policy

mandate for the purposes of an abusive discharge claim.  It is not that I am unwilling to go

outside of state legislative enactments to determine Maryland public policy.  However, I am

circumspect about such action since it is normally and preferably the function of the legislative

branch.   In my view, Goode suggested state public policies that are too expansive and vague to

provide her with a basis for relief.

Finally, Goode proffers a somewhat unique public policy source—the interrelationship

between a provision of the United States Internal Revenue Code and AMVETS's employee

handbook.   Goode asserts she was terminated for reporting instances of private inurement of

AMVETS money and property—prohibited for tax-exempt entities under 26 U.S.C. §

501(c)(19(C)—even though the employee handbook required such reporting[7] and guaranteed

whistleblower protection.[8]  (Compl. ¶¶ 113, 116.)   Goode argues that because she was required

to report these alleged violations pursuant to AMVETS's employee handbook, her discharge for

fulfilling her duty to report constitutes a violation of public policy.  (Goode Opp'n at 9–10.)  In

essence, Goode avers her alleged retaliatory discharge for reporting improper private inurement

of nonprofit assets amounts to a public policy mandate of sufficient clarity to warrant an

---

[7] Article 7.15 of the handbook states: "It is the duty of all employees to properly maintain and report deficiencies of, and abuses to, AMVETS' property."  (Compl. Ex. A at 5.)

[8] AMVETS's Whistleblower Policy states: "It is the responsibility of all directors, officers and employees to comply with these standards and to report violations or suspected violations."  (*Id.* at 43–44.)  The policy also has a no retaliation provision which provides that "no director, officer or employee who in good faith reports a violation of the standards shall suffer harassment, retaliation or adverse employment consequence."  (*Id.*)  The purpose of the policy is "to encourage and enable employees and others to raise serious concerns within the Organization prior to seeking resolution outside the Organization."  (*Id.*)

exception to the at will doctrine and allow her claim for abusive discharge to proceed.  Neither of

these two sources, taken separately or together, bestows a specific legal duty such that

termination for exercising the duty contravenes a clear mandate of public policy.[9]

In *Thompson*, the plaintiff asserted an abusive discharge claim, alleging the defendant

improperly fired him because the plaintiff intended to report discovered "operational illegalities."

925 F. Supp. at 407.  The District Court of Maryland dismissed the plaintiff's claim because

even though "[p]laintiff might have felt morally obligated to report the misadministrations, and

indeed his suspicions . . . were later confirmed by a state inspection . . . [the] plaintiff was under

no legal duty to act as he did, and therefore any public policy embodied in [the Maryland law

defining such "operational illegalities"] [did] not protect plaintiff from discharge."  *Id*.; *see also*

*Milton*, 138 F.3d at 523 (4th Cir. 1998) (holding that no statute or other legal source imposed on

plaintiff a duty to report defendant's alleged tax fraud to form the basis for an abusive discharge

claim).

Similarly, Goode was under no legally prescribed duty to report Hart's alleged financial

improprieties.  The provision of the United States Internal Revenue Code Goode cites provides

as a condition for tax-exempt status, that no portion of the net earnings inure to the benefit of any

private shareholder or individual.  26 U.S.C. 501(c)(19)(C).  Nowhere in the language of the

statute is there an affirmative duty placed on employees of tax-exempt organizations to report

suspected violations.  And even if there were such a duty, reporting to a superior, rather than an

---

[9] The fact that the prohibition on private inurement is a matter of federal policy does not on its
own preclude it from serving as a public policy source for a state tort cause of action.  Federal
public policy is incorporated into Maryland public policy because Maryland has an interest in its
citizens obeying the law.  *Adler*, 538 F. Supp. at 580 (finding public policy underlying federal
tax laws a proper basis for an abusive discharge claim because "federal policy . . . is incorporated
as public policy by the State of Maryland").

external law enforcement officer or agency, would not be an exercise of that duty.  Thus, the

Code provision is an insufficient public policy source to support an abusive discharge claim

because it confers no duty upon Goode.

The employee handbook likewise seems to be an insufficient public policy source.  Even

though it might confer a duty, it is not a legally cognizable duty; the employee handbook is not a

*legal* source bestowing *legal* obligations.  A general provision in a policy handbook does not rise

to the level of a statutory duty, and Goode does not point to any binding authority to persuade

this court otherwise.  As the *Adler* court recognized, "[courts] have always been aware . . . that

recognition of an otherwise undeclared public policy as a basis for a judicial decision involves

the application of a very nebulous concept to the facts of a given case, and that declaration of

public policy is normally the function of the legislative branch." *Adler*, 432 A.2d at 472.  While

at first glance it seems that provisions of an employee handbook, especially of the general policy

sort at issue in this case, cannot serve as the "clear mandate of public policy" required for an

abusive discharge claim, upon further consideration Goode's argument gives me pause.  In the

event that Goode did not report the private inurnment of AMVETS' funds, AMVETS would be

within its rights to discharge Goode based on Article 7.15 of the handbook, which bestows a duty

to report misuse of AMVETS' property.   It seems wrong, then, that Article 7.15 can serve as a

proper basis for termination yet cannot serve as a sufficient public policy basis on which to assert

an abusive discharge claim in the event an employee is discharged after fulfilling his obligations

under Article 7.15.  I will allow this claim to go forward for limited discovery on this point.

Defendant AMVETS retains the right to renew its summary judgment motion upon discovery.

ii.  *FLSA and Analogous State Law Violations (Count IV)*[10]

The Fair Labor Standards Act ("FLSA") requires employers to pay overtime to employees who work in excess of forty hours per week.  29 U.S.C. § 207(a)(1).  However, employees who work in a "bona fide executive, administrative, or professional capacity" are exempt from overtime pay.  29 U.S.C. § 213(a)(1).  Only the administrative exemption is at issue in this case.  Federal regulations adopted by the Secretary of Labor have further defined the scope of an exempted employee working in an administrative capacity.  *See* C.F.R. § 541.200.  The regulations provide that the term "employee employed in a bona fide administrative capacity" means any employee:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).  Application of the overtime exemption is an affirmative defense for which the employer bears the burden of proof, *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97 (1974), and exemptions "are to be narrowly construed against the employers seeking to assert them."  *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960).

It is undisputed that AMVETS treated Goode as an exempt employee.  Goode was offered a "full-time exempt position," as stated in AMVETS's offer letter.  (Compl. Ex. B.)  In

---

[10] The FLSA analysis applies equally to Maryland's analogous Wage and Hour Law.  Md. Code Ann., Lab. & Empl. § 3-415.  In her opposition to defendants' motions, Goode focuses solely on Count IV's retaliation claim.  I, however, will address both the retaliation and overtime pay claims raised in her complaint.

addition, Section 2.4 of the employee handbook, entitled "Employee Status Definitions," defined

"exempt employee" as follows:

> "Exempt Employees" – Unless otherwise specified will mean
> exempt from the daily and weekly overtime requirements of: (1)
> the Fair Labor Standards Act as amended (Federal Wage and Hour
> law); and (2) the Walsh-Healey Public Contracts Act.  Exempt
> employees are eligible for all AMVETS benefits.

(Compl. Ex. A. 9.)  What is disputed, however, is whether Goode was, in fact, a non-exempt

employee.

Goode states that she often worked upwards of sixteen-hour days and on such occasions

she was not paid overtime, while other support staff with similar supervisory responsibilities

were paid overtime.  (Compl. ¶ 155.)  During one of the events she worked on, Goode avers she

was the only administrative employee who was not paid overtime.  (Goode Aff. ¶ 24, ECF No.

23, Ex. A).  After discovering this, Goode raised the issue with King, but it was never resolved.

(*Id*. at ¶ 24.)  Then, in late March 2009, Goode alleges she requested "comp time" from King for

over 100 hours of overtime work performed between December 2008 and March 2009.  (*Id*. at ¶

27.)  King purportedly responded by refusing to reevaluate whether Goode was an

administrative employee.  (Compl. ¶ 157.)

In asserting entitlement to back overtime pay, Goode sets forth more than empty

assertions and presents a genuine issue of material fact as to whether AMVETS improperly

classified her as an exempt employee.  Dismissal is therefore inappropriate, as is summary

judgment.  AMVETS completely ignores the overtime payment portion of Count IV;  AMVETS

does not address Goode's claim for overtime in its motion or subsequent reply memorandum.

Whether Goode's position involved the exercise of discretion and independent judgment

required for the administrative exemption is a contested factual issue, and one that is dispositive

of Goode's cause of action.  Thus, AMVETS's motion for summary judgment is denied on this claim.[11]

Goode also raises a FLSA retaliation claim in addition to her overtime claim.  The FLSA contains a retaliation provision making it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding [seeking overtime payments], or has testified or is about to testify in any such proceeding."  29 U.S.C. § 215(a)(3).  A plaintiff asserting a claim of retaliation under the FLSA must show that "(1) he engaged in an activity protected by the FLSA; (2) he suffered adverse action by the employer subsequent to or contemporaneous with such protected activity; and (3) a causal connection exists between the employee's activity and the employer's adverse action."  *Jackson v. Mayor & City Council of Baltimore City*, No. JFM 08-3103, 2009 WL 2060073, at *2 (D. Md. July 14, 2009) (citing *Darveau v. Detecon, Inc.,* 515 F.3d 334, 340 (4th Cir. 2008)).  Once the plaintiff makes out a *prima facie* case of retaliation, the burden shifts to the defendant to provide a legitimate, non-discriminatory purpose for the adverse employment action.  *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  Then, the burden shifts back to the plaintiff, who must prove defendant's stated purpose is merely pretextual.  *Id.*

Goode's retaliation claim fails because she does not allege that she was engaged in a protected activity prior to or contemporaneous with her discharge.  Goode avers she reported the alleged FLSA overtime pay violation to the DOL on September 17, 2009, several weeks after her

---

[11] Goode avers she was in contact with a DOL investigator who, after reviewing documentation Goode provided, determined Goode was a "non-exempt" employee and advised Goode that she would be contacting AMVETS to request back pay for the overtime hours.  (Goode Aff. ¶ 51.) Before proceeding any further, this court requests an update on this process.  If AMVETS is already in the process of paying Goode back pay, there is no role for the court to play in this matter.

discharge.  (Compl. ¶ 94.)  Thus, this cannot be the predicate for her FLSA retaliation claim

because her discharge, the alleged adverse employment action, was not subsequent to or

contemporaneous with, but, in fact, prior to, the protected activity.   The only other potential

predicate activity is Goode's complaint to King.  This is insufficient, however, because the

Fourth Circuit has expressly held that "the FLSA's anti-retaliation provision does not extend to

internal complaints."  *Whitten v. City of Easley*, 62 Fed. Appx. 477, 480 (4th Cir. 2003); *see also*

*Jackson*, 2009 WL 2060073, at *8 (D. Md. July 14, 2009) ("The Fourth Circuit has interpreted

the FLSA retaliation provision to require the institution of a formal proceeding, as opposed to an

internal complaint to a supervisor . . . .").  Thus, Goode fails to plead a legally sufficient cause of

action for retaliation, and her claim is therefore dismissed.

  *iii.  Tortious Interference with Business, Economic, and Contractual Relations (Count V)*

  The Maryland Court of Appeals has outlined the scope of the tort of interference with

contractual or business relationships:

> [T]he two general types of tort actions for interference with
> business relationships are inducing the breach of an existing
> contract and, more broadly, maliciously or wrongfully interfering
> with economic relationships in the absence of a breach of contract.
> The principle underlying both forms of the tort is the same: under
> certain circumstances, a party is liable if he interferes with and
> damages another in his business or occupation.

*Kaser v. Fin. Prot. Mktg., Inc.*, 831 A.2d 49, 53 (Md. 2003) (quoting *Natural Design, Inc. v.*

*Rouse Co.*, 485 A.2d 663, 674 (Md. 1984)).  A cause of action for tortious interference with

economic relations extends to terminable at will relationships.  *See Kramer v. Mayor of*

*Baltimore*, 723 A.2d 529, 539 (Md. Ct. Spec. App. 1999).  Because the alleged interference

pertains to what this court has determined to be an at will relationship, the court will construe

this count as a claim for intentional interference with economic relations.

18

An action for tortious interference with economic relations differs from interference with contractual relations in that "the right of an individual to interfere, which is narrowly restricted in an interference with contract action, is treated more broadly in an action claiming interference with economic relations." *Kramer*, 723 A.2d at 539–40; *see also Natural Design*, 485 A.2d at 674 ("A broader right to interfere with economic relations exists where no contract or a contract terminable at will is involved.") By its very nature, a contract terminable at will holds no legal assurance of future performance, "thus a competitor who intentionally causes a third person not to continue an existing contract terminable at will does not improperly interfere with the contractual relation if no wrongful means are employed." *Macklin v. Robert Logan Assocs.*, 639 A.2d 112, 121 (Md. 1994).

To make out a claim of tortious interference with economic relations, a plaintiff must demonstrate (1) an intentional and willful act on the part of the defendant; (2) calculated to cause damage to the plaintiff in plaintiff's economic relations; (3) done with an unlawful purpose, without right or justification (which constitutes malice); and (4) resulting in actual damage and loss to the plaintiff. *Blondell v. Littlepage*, 991 A.2d 80, 97 (Md. 2010). The essential element is that the interference be "by conduct that is independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships. Wrongful or unlawful acts include common law torts and violence or intimidation, defamation, injurious falsehood or other fraud, violations of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith." *Kramer*, 723 A.2d 529 at 540 (1999) (internal quotation marks omitted) (citing *Alexander & Alexander, Inc. v. B. Dixon Evander Assocs., Inc.*, 650 A.2d 260 (1994)). As the Maryland Court of Appeals has emphasized, "[s]imply because a person induces another to exercise an existing right to terminate a contract, even if that person's intention with

regard to one of the parties to the contract is tortious, does not make it actionable. That is, his or

her conduct is not thereby rendered improper or wrongful as a matter of law." *Macklin*, 639 A.2d

112, 119 (Md. 1994).

Goode avers defendants Hart and Tucker conspired to improperly interfere with, and

ultimately did, in fact, interfere with, Goode's relationship with AMVETS by persuading King to

discharge Goode under the pretext of a "Reduction in Force."  (Compl. ¶ 163.)  Goode maintains

Hart was acting outside the scope of her duties in furtherance of her own interests and not those

of her employer, AMVETS.  (Compl. ¶ 165.)[12]

Of all the counts in Goode's complaint, this count is the most factually anemic. The

complaint merely states, in a conclusory fashion, that defendants tortiously interfered with

Goode's employment by improper motive or through improper means.  (Compl. ¶¶ 162–68.)

However, Goode does not allege facts from which this court could infer that defendants' conduct

was wrongful or unlawful.  She does not allege any specific tortious conduct done by defendants

Hart and Tucker together or separately.  *Macklin*, 639 A.2d at 119.  Thus, the basis of her

tortious interference claim amounts to nothing more than insufficient labels and conclusions.

*Twombly*, 550 U.S. at 555.  As a result, Count V is dismissed.

### iv.  Civil Conspiracy (Count VI)

---

[12] As a matter of law, a party to a contract cannot tortiously "interfere" with his or her own
contract. *Bagwell*, 665 A.2d 297, at 313 (citing, among other cases, *Natural Design,* 485 A.2d at
663).  An agent of a party to a contract, acting within the scope of the agency relationship,
similarly cannot interfere with the contract.  *Id.*; *see also Cont'l Cas. Co. v. Mirabile*, 449 A.2d
1176, 1185 (Md. Ct. Spec. App. 1982).  Cognizant of this, Goode simply alleges Hart was acting
outside the scope of her employment.  Goode provides no factual basis to support this bald
assertion.  I need not reach this issue, however, because Count V is nothing but a list of
conclusory statements and fails to overcome defendants' 12(b)(6) motions.

Civil conspiracy has been defined in Maryland as the following:

> [A] combination of two or more persons[13] by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal with the further requirement that the act or the means employed must result in damages to the plaintiff. . . . No action in tort lies for conspiracy to do something unless the acts actually done, if done by one person, would constitute a tort.

*Robb v. Wancowicz*, 705 A.2d 125, 132 (Md. Ct. Spec. App. 1998) (internal quotation marks and citations omitted).

Civil conspiracy is a "parasite tort," *Kramer*, 723 A.2d at 542; it "is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff." *Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 665 A.2d 1038, 1045 (1995) (quoting *Alexander*, 650 A.2d at 265 n.8). Here, Goode cannot recover for civil conspiracy because her claims for the alleged underlying torts are dismissed. Count VI is therefore dismissed.

## B. Summary Judgment

> ### v. *Breach of Express and Implied Agreement, Breach of the Employee Policy Manual, and Promissory Estoppel (Count II)*
>
> #### a. Breach of Express and Implied Agreement[14]

As discussed above, in Maryland, "an employment contract of indefinite duration is considered employment 'at will' which, with few exceptions, may be terminated without cause

---

[13] The "two or more persons" requirement must take into account that a conspiracy cannot take place between a corporation and its agent acting within the scope of his or her employment. *Id*. *Columbia Real Estate*, 384 A.2d at 472. *See* related discussion *supra* note 12.

[14] In her opposition to defendants' motions, Goode seems to focus solely on the "breach of the employee manual" cause of action and ignores the other causes of action included in Count II of her complaint. I address all causes of action asserted in the complaint but will discuss the "breach of AMVETS' employee manual" in greater detail.

by either party at any time." *Elliott v. Bd. of Trustees of Montgomery Cnty. Cmty. Coll.*, 655

A.2d 46, 49 (Md. Ct. Spec. App. 1995) (quoting *Castiglione v. Johns Hopkins Hosp.*, 517 A.2d

786 (Md. Ct. Spec. App. 1986)); *see also Lubore v. RPM Assocs., Inc.*, 674 A.2d 547, 554 (Md.

Ct. Spec. App. 1996) ("It is a longstanding principle in Maryland that an indefinite hiring is

*prima facie* a hiring at-will.").  In the at will employment context, absent a contravening public

policy as the court has found to be the case here, an employer may "terminate an employee for

any reason, even a reason that is arbitrary, capricious, or fundamentally unfair," and it is not the

role of the court to "review either the employer's (1) motivation or (2) factual bases for

termination."  *Towson Univ. v. Conte*, 862 A.2d 941, 949 (Md. 2004) (citing, among other cases,

*Porterfield v. Mascari II, Inc.*, 823 A.2d 590, 602 (Md. 2003)).

Goode contends that AMVETS's assertions during her interview, in her offer letter, and

in the employee handbook established an express or implied-in-fact employment contract.

(Compl. ¶ 118.)  Goode avers her discharge constitutes a material breach of this contract.

(Compl. ¶¶ 133–34.)  However, Goode puts forth no evidence supporting a breach of contract

claim.  Goode was unquestionably an at-will employee and there was no employment contract

that limited AMVETS's right to terminate her employment.  Goode's signed offer letter included

the following provision:

> Finally, please understand that Maryland is an "employment at
> will" state.  This means that either you or AMVETS may, at your
> or our discretion, terminate our employment relationship at any
> time.  Completion of the designated probationary period does not
> change your status as an at-will employee or in any way restrict
> AMVETS's right to terminate you or change the terms or
> conditions of your employment.  This letter cannot be construed as
> a contract, but as an offer of employment for an indeterminate
> period of time.

(Compl. Ex. B.)  Thus, the at-will nature of her employment was made explicitly clear from the

outset.  It was further reinforced in the introduction to the employee handbook Goode received:

> This personnel policy manual is not a contract between any
> employee and AMVETS and it should not be considered as such
> under any conditions.  AMVETS, in accordance with applicable
> state law, is an employment at will employer, at will employees
> may be terminated with or without notice or cause.

(Compl. Ex. A. at 7.)  Upon receiving the manual, Goode signed Addendum 8 (titled "Receipt of

Personnel Policies Manual"), thereby acknowledging her understanding and acceptance of the

terms of the handbook.  Addendum 8 included the following language:

> I understand and acknowledge that this handbook is only a general
> guide.  It is not intended to be, and should not be, construed as a
> contract. . . . I further understand the employment-at-will doctrine,
> a doctrine that is part of the fabric of my state's non-statutory or
> "common" law, which provides that an employee who does not
> have a written contract of employment for a specified period of
> time can be terminated at any time.  An at-will employee can be
> terminated with or without notice or cause.

(Compl. Ex. A. at 48).

In short, on three separate occasions AMVETS made it explicit that Goode's employment

was at will.  On one of these occasions Goode included her signature below the at-will language,

acknowledging the at-will nature of her employment.  No reasonable jury could find that

Goode's employment was anything other than at will.

Moreover, Goode's allegations that AMVETS officials discounted the importance of the

at-will language, (Goode Aff. ¶¶ 5, 7, ECF No. 23 Ex. A.), are insufficient and unpersuasive.

Goode asserts King and Isaja told her that she could work "as long as [she] wished."  (Goode

Aff. ¶ 3.)  Accepting this as true, such a period is too indefinite and non-specific to rebut the at-

will presumption.  *See Lubore*, 674 A.2d at 554 (citing *Mazaroff, Maryland Employment Law* §

3.2 at 166 (1990)) (The presumption of at-will employment "can be overcome by express or

23

implied terms which show that the parties clearly intended to create a binding relationship for a *specific* period of time or until *certain* conditions occur.") (emphasis added)).  An employer usually expects its employees, particularly new hires, to work for the foreseeable future.  Stating such an expectation, or expressing hope for a long-term relationship, does not transform an at will employment relationship into one for a specific duration or prohibit dismissal except for cause.  *Id.* (citing *Winand v. Case*, 154 F. Supp. 529, 545 (D. Md. 1957) (finding that, even where a contract stated, "it is also our desire to have [the employee] remain active in the business indefinitely," the employee was an at-will employee for an indefinite period)).

Looking at all facts and inferences drawn therefrom in the light most favorable to Goode, there is no genuine issue of material fact that supports denying summary judgment.  *Anderson*, 477 U.S. at 247–48.  Given that Goode's employment was at will, there is no support for a breach of contract claim because AMVETS has unfettered discretion in its decisions to terminate at-will employees.  That is the very nature of at-will employment.  Therefore, AMVETS's motion for summary judgment is granted on this claim.

b.   Breach of the Employee Policy Manual

In addition to her breach of contract claim, Goode also presents a cause of action for a "breach of the employee policy manual."  The court reads this claim as alleging a breach of an implied contractual obligation.  Although Maryland courts have recognized implied contracts based on employee manuals, *see Dahl v. Brunswick Corp.*, 356 A.2d 221 (Md. 1976); *Staggs v. Blue Cross of Md., Inc.*, 486 A.2d 798 (Md. Ct. Spec. App. 1985), they have also held that an effective disclaimer precludes such a finding.  *Fournier v. United States Fid. & Guar. Co.*, 569 A.2d 1299 (Md. Ct. Spec. App. 1990); *Castiglione v. Johns Hopkins Hosp.*, 517 A.2d 786 (Md.

24

Ct. Spec. App. 1986).  AMVETS's employee handbook contained a clear and unambiguous disclaimer; therefore, the handbook in no way created enforceable contract rights.

In *Staggs*, the Maryland Court of Special Appeals recognized the potential for a "properly expressed and communicated" provision of an employee handbook  that "limi[ts] the employer's discretion to terminate an indefinite employment" to constitute contractual undertakings enforceable by the employee.  *Staggs*, 486 A.2d at 803.  The holding was a narrow one.  The court cautioned "that not every statement made in a personnel handbook or other publication will rise to the level of an enforceable covenant . . . general statements of policy are no more than that and do not meet the contractual requirements for an offer."  *Id*. (internal quotation and citation omitted); *see also Haselrig v. Pub. Storage*, 585 A.2d 294 (Md. Ct. Spec. App. 1991).  The next year, in *Castiglione*, the Maryland Court of Special Appeals emphasized *Staggs'* limited recognition of implied contractual rights from an employee manual:

> [U]nlike the situation in *Staggs*, in this case the appellee expressly negated, in a clear and conspicuous manner, any contract based upon the handbook for a definite term and reserved the right to discharge its employees at any time. . . . The purpose of the *Staggs* exception to the at will doctrine is to protect the legitimate expectations of employees who have justifiably relied on manual provisions precluding job termination except for cause. . . . Justifiable reliance is precluded where, as in the case at hand, contractual intent has been expressly disclaimed.

517 A.2d at 793–94 (internal citations omitted); *cf. Bagwell v. Peninsula Reg'l Med. Ctr.*, 665 A.2d 297, 309 (Md. Ct. Spec. App. 1995) (relying on *Castiglione* and holding that the handbook at issue validly disclaimed the creation of contractual rights).

The AMVETS employee handbook is much closer to that in *Castiglione* than that in *Staggs*.  Far from including contractual undertakings, the introduction to the AMVETS handbook includes the following clear and unambiguous disclaimer:  "This personnel policy manual is not a contract between any employee and AMVETS and it should not be considered as such under

any conditions." (Compl. Ex. A at 7.)   The introduction explains that the handbook "describes current personnel policies" as "an informational service to the employees." (*Id.*)  These policies are, as the introduction states, "subject to modification, suspension or termination with or without notice." (*Id.*)  The introduction also states that "AMVETS reserves the right to change corporate policies and employee benefits, and to amend the personnel policy manual and the information contained therein as it sees fit in its sole and unfettered discretion." (*Id.*)  Not only has contractual intent been expressly disclaimed, but the policies themselves are flexible and open to unilateral modification.  Thus, the handbook holds no legal significance on which to base a cause of action in contract.  AMVETS's motion for summary judgment is granted with respect to this claim.

c.   Promissory Estoppel

Lastly, Count II seeks relief based on promissory estoppel.  "[I]n Maryland, promissory estoppel is an alternative means of obtaining contractual relief." *Maryland Transp. Auth. Police Lodge # 34 of the Fraternal Order of Police, Inc. v. Maryland Transp. Auth.*, 5 A.3d 1174, 1227 (Md. Ct. Spec. App. 2010), *rev'd on other grounds*, 21 A.3d 1098 (Md. 2011).  Under Maryland law, the elements of a claim for promissory estoppel are: (1) a clear and definite promise by the promisor; (2) where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee; (3) which does induce actual and reasonable action or forbearance by the promisee; and (4) causes a detriment which can only be avoided by the enforcement of the promise. *Horlick v. Capital Women's Care, LLC*, -- F. Supp. 2d --, 2011 WL 7144125 (D. Md. 2011) (citing *Pavel Enters., Inc. v. A.S. Johnson Co.*, 674 A.2d 521, 532 (Md. 1996).  The Maryland Court of Appeals has instructed that a "court, and not a jury, must determine that binding the [promisor] is necessary to prevent injustice." *Huffman v. Town of La*

*Plata*, No. Civ. A. DKC 2004-2833, 2005 WL 1038854 (D. Md. May 4, 2005) (quoting *Pavel Enters.*, 674 A.2d at 533).

Goode avers her discharge contradicted AMVETS's representations and commitments. (Compl. ¶ 10.)  Goode further asserts King made express promises of job stability to encourage Goode to accept AMVETS's employment offer.  (Compl. ¶ 119.)  Specifically, Goode alleges King "assured" her that as long as she performed her job responsibilities, she could work at AMVETS for as long as she wanted, subject to dismissal only for cause.  (Compl. ¶¶ 45, 119.) Despite the at-will language in the offer letter, Goode states King and Isaja dismissed the language as "legalese" to "keep the lawyers happy."  (Compl. ¶ 122.).

Even construing all factual allegations in the light most favorable to Goode, there is insufficient evidence to find that justice requires AMVETS be bound to their alleged promises. There is nothing in the record that supports an inference of reasonable reliance, that it was reasonable for Goode to rely on oral statements so blatantly contradicted by three separate writings.  The terms of her at-will employment were formalized in her offer letter and reinforced again by both the introduction to the employee handbook and her signed receipt of the handbook. All of these clearly stated the employment was "at will," putting Goode on actual notice that her employment was at will and vitiating any reasonable reliance.  Goode has therefore failed to make a sufficient showing to establish an essential element for the claim of promissory estoppel. Summary judgment for AMVETS is granted on this claim.

   *vi.  ERISA Violations (Count III)*

Section 510 of ERISA provides:

> It shall be unlawful for any person to discharge . . . a participant or
> beneficiary . . . for the purpose of interfering with the attainment of

> any right to which such participant may become entitled under [an employee benefit plan], this sub chapter, or the Welfare and Pension Plans Disclosure Act . . . .  The provisions of section 1132 of this title [which provides for civil enforcement] shall be applicable in the enforcement of this section.

29 U.S.C. § 1140.  The Fourth Circuit has interpreted the language "attainment of any right . . . to which such participant *may* become entitled" to provide an employee a cause of action when the employee is discharged to prevent vesting in a qualified pension plan or o prevent accrual of additional benefits.  *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 236, 237–38 (4th Cir. 1991).

A § 510 claim requires proof of the employer's specific intent, i.e., that the employer discharged the employee with the purpose of interfering with the employee's pension rights.  *Id.* at 238 ("[I]t is necessary to separate the firings which have an incidental, albeit important effect on employee's pension rights from the actionable firings, in which the effect of the firing on the employer's pension obligation was a motivating factor in the firing decision.").  The Fourth Circuit recognizes, however, that the specific intent requirement results in proof problems similar to those in the Title VII context—employers do not often articulate the motivation for their actions, particularly if those actions are unlawful.  *Id.* at 239.  Thus, allocating the burdens of proof, the court imports the three-step *McDonnell Douglas* scheme of presumptions and shifting burdens utilized in the Title VII context.  *Id.* (adopting the *McDonnell Douglas* analysis in the ERISA context as laid out in *Gavalik v. Cont'l Can Co.*, 812 F.2d 834, 851 (3d Cir. 1987)).

As in the Title VII context, employees alleging discrimination under ERISA bear the initial burden of making out a *prima facie* case.  *Gavalik*, 812 F.2d at 852 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  To establish a *prima facie* case under ERISA § 510, an employee must demonstrate that (1) the employer performed a prohibited

action (2) for the purpose of interfering (3) with the attainment of a right to which the employee is currently, or in the future may become, entitled. *Id.* If the plaintiff establishes a *prima facie* case by a preponderance of the evidence, the burden shifts to the employer to state a legitimate, nondiscriminatory explanation for the challenged conduct. *Id.* If the employer carries its burden and successfully demonstrates a legitimate, nondiscriminatory explanation, the burden then shifts back to the plaintiff, who is given the opportunity to establish by a preponderance of the evidence that the defendant's explanation is pretextual. *Id.*

A plaintiff's unsubstantiated allegations and bald assertions are insufficient to defeat a motion for summary judgment, *Jacobsen v. Towers Perrin Forster & Crosby, Inc.*, No. RDB-05-2983, 2008 WL 782477, at *10 (D. Md. March 20, 2008) (citing *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996)), because a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F. Supp. 2d 373, 375 (D. Md. 2001) (internal citations omitted). If the plaintiff fails to present facts that permit a reasonable inference of pretext, summary judgment should be granted in defendant's favor. *Jacobsen*, 2008 WL 782477, at *10 (citing *Rowe v. Marley Co.*, 233 F.3d 825, 830 (4th Cir. 2000)). Ultimately, then, on summary judgment a § 510 claim comes down to plaintiff's evidence supporting pretext. *Dister v. Cont'l.. Grp., Inc.*, 859 F.2d 1108 (2d Cir. 1988) (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

Goode avers her discharge was a willful attempt to deprive her of rights protected by ERISA. More precisely, she contends that preventing the impending vesting of her rights under AMVETS's ERISA plan was a motivating factor in her discharge. Under the *McDonnell Douglas* scheme, Goode's § 510 claim ultimately fails because she does not demonstrate a genuine issue on the matter of pretext. Similar to the facts in *Conkwright*—which, like here,

involved insufficient facts to support a § 510 claim—the only evidence Goode puts forth[15] to support her claim of pretext is the e-mail discussion among AMVETS officials regarding the cost-saving potential of Goode's termination.  *Conkwright*, 933 F.2d at 239 ("It is obvious that benefit costs make up a large amount of the costs of an employee to a company, and that pension rights are a substantial component of benefit costs, but these undeniable propositions are not sufficient standing alone to prove the requisite intent by the path of pretext.").

Goode points to Exhibit 3 of defendant Tucker's motion, (ECF No. 16-2), in which Hart informs King via e-mail that terminating Goode's employment in favor of contracting out the meeting planner duties would save around $20,000.  (Goode Opp'n at 40.)  Goode argues that this is "evidence that AMVETS discharged [her] because of the savings that would result from the termination of ERISA benefits."  (*Id*.)  This number reflects the potential reduction in the overall expenditure for meeting planner services, taking into account both salary and benefits costs, but there is no special attention paid, or discussion focusing on, the benefits portion.  As in *Conkwright*, this supports an argument that cost-saving was a factor in Goode's termination (as AMVETS readily admits), but it does not support an assertion that benefits in particular were targeted.  *Conkwright*, 933 F.2d at 239 ("As a number of courts have recognized, it is not sufficient for an employee to allege lost opportunity to accrue additional benefits as evidence of the employer's specific intent to violate ERISA; rather, a plaintiff must adduce facts, which if taken as true, could enable a jury to identify unlawful intent from the other various reasons why

---

[15]  Goode also points to the increase in AMVETS's gross revenue in 2009, demonstrated by AMVETS's 2010 Federal Form 990 tax return, as evidence that the budgetary "Reduction in Force" explanation for her termination in 2009 was pretextual.  (Goode Opp'n, Ex. D.) However, the exhibit does not include total expenditures, net profit, or other information.  Without the ability to properly evaluate gross revenue, the exhibit is not probative.

an employer might have terminated plaintiff, and to conclude that the employer harbored the requisite unlawful intent.").

In sum, Goode has not produced sufficient evidence to support a reasonable inference of pretext.  In fact, Goode fails to supply any connection, either through direct or circumstantial evidence, between her discharge and AMVETS's attempt to prevent her from attaining ERISA-protected benefits.  No reasonable jury could find unlawful intent, even after taking as true Goode assertions.  Therefore, summary judgment is appropriate.

> ### vii. Fraudulent (Intentional), or in the Alternative, Negligent Misrepresentation (Counts VII and VIII)

In Maryland, a claim for fraud requires that "(1) the defendant made a false representation to the plaintiff; (2) its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth; (3) the misrepresentation was made for the purpose of defrauding the plaintiff; (4) the plaintiff relied on the misrepresentation and had the right to rely on it; and (5) the plaintiff suffered compensable injury resulting from the misrepresentation." *McKenzie v. Comcast Cable Commc'n, Inc.*, 393 F. Supp. 2d 362, 373 (D. Md. 2005) (quoting *Alleco*, 665 A.2d at 1047)).  A plaintiff asserting a fraud claim is subject to Federal Rule of Civil Procedure 9(b), which requires that fraud counts be plead with particularity.  Fed. R. Civ. P. 9 (b).  The Fourth Circuit has held "particularity" to mean "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (quoting 5 Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure: Civil* § 1297, at 590 (2d ed. 1990)).  At the summary judgment phase, a plaintiff must produce clear and convincing evidence to support a claim of fraud. *DeGirolamo v. Sanus Corp. Health Sys.*, 1991 WL 103383 at *4 (4th Cir. June 17, 1991).

The elements of a claim for negligent misrepresentation are similar.  The plaintiff must prove  "(1) the defendant, owing a duty of care to the plaintiff, negligently assert[ed] a false statement; (2) the defendant intend[ed] that his statement [would] be acted upon by the plaintiff; (3) the defendant ha[d] knowledge that the plaintiff [would] probably rely on the statement, which, if erroneous, [would] cause loss or injury; (4) the plaintiff, justifiably, [took] action in reliance on the statement; and (5) the plaintiff suffer[ed] damage proximately caused by the defendant's negligence." *Goldstein v. Miles*, 859 A.2d 313, 332 (Md. Ct. Spec. App. 2004) (citing *Martens Chevrolet, Inc. v. Seney*, 439 A.2d 534 (Md. 1982)).  Because the action sounds in negligence, the plaintiff must show that the defendant owed the plaintiff a duty.  *Cooper v. Berkshire Life Ins. Co.*, 810 A.2d 1045, 1054 (Md. Ct. Spec. App. 2002).  Such a duty exists in a prospective employer-employee relationship; the employer owes a duty to speak with reasonable care.  *Giant Food, Inc. v. Ice King, Inc.,* 536 A.2d 1182, 1185 (Md. Ct. Spec. App. 1988) ("[T]he most common example of the duty to speak with reasonable care is based on a business or professional relationship, or one in which there is a pecuniary interest."); *see also Griesi v. Atl. Gen. Hosp. Corp.,* 756 A.2d 548, 553 (Md. 2000) (holding that the duty exists in pre-employment negotiations).

In support of her contention that King and Isaja's misrepresentations constituted fraud or, at the very least, negligent misrepresentation, Goode alleges King provided false statements regarding the nature of AMVETS's work environment, the reasons behind the departure of several previous meeting planners, and the job stability Goode could expect.  (Goode Opp'n at 51–53.)  Goode avers that none of these statements were truthful.  (*Id.*)  Goode argues that when making these representations King and/or Isaja knew them to be false, or at least failed to exercise reasonable care as to their truth.  (*Id.*)  It was King's goal, Goode asserts, to use these

false statements to encourage Goode to accept the job offer.  (*Id*.)  Goode contends that, as King

had hoped, she relied upon King's statements and assurances to her detriment.  (*Id*.)  Goode

alleges she suffered damages as a result of forsaking other employment offers.  (*Id*.)

   Goode meets the respective pleading standards for both fraudulent (intentional)

misrepresentation and negligent misrepresentation.  As such, Counts VII and VIII overcome

AMVETS's motion to dismiss.  These Counts do not, however, pass muster under the summary

judgment standard.  Goode's failure to adequately address the issue of reasonable reliance—an

important element for both intentional (fraudulent) and negligent misrepresentation—is fatal to

her claims.  A fraud claim requires the plaintiff had "the right to rely" on the alleged statements,

meaning the reliance is reasonable in light of the surrounding circumstances.  *Goldstein*, 859

A.2d at 332 (Md. Ct. Spec. App. 2004) (citing *Sass v. Andrew*, 832 A.2d 247, 267 (Md. Ct. Spec.

App. 2003)).  Similarly, an action for negligent misrepresentation requires that the plaintiff could

"justifiably take action in reliance" on the alleged statements.  *Id*.  (citing *Martens Chevrolet,*

*Inc.,* 439 A.2d at 534).

   Taking King and Isaja's alleged statements as true, and looking at all surrounding facts

most in favor of Goode, no jury could find Goode's reliance to be reasonable.  First, in terms of

the alleged misrepresentations regarding job stability, it is patently unreasonable to rely on oral

statements directly contradicting several explicit, written statements defining the employment as

at will.  Second, in terms of the alleged misrepresentation of AMVETS's positive "team

environment," it is unreasonable to rely on a prospective employer's general assertions about

company culture.  One wouldn't expect an employer to denigrate fellow co-workers or speak

negatively of the relationships among employees.  Beyond its inherent subjectiveness, it is

absurd to think that an employer's statements about collegiality could form the basis of a

misrepresentation claim. If that were the case, the courts would be flooded with suits from disillusioned employees.

In conclusion, viewing the evidence in the light most favorable to Goode, a reasonable jury could not find by clear and convincing evidence that AMVETS, through King and Isaja, made intentionally or negligently false representations on which Goode rightfully relied. Therefore, AMVETS's summary judgment motion is granted.

CONCLUSION

For the aforementioned reasons, (1) Goode's Rule 56(d) motion is denied; (2) defendants' motions to dismiss are granted as to Counts IV (in part), V, and VI ; (3) defendants' motions for summary judgment are granted as to Counts II, III, VII, and VIII; and (4) defendants' motions are denied with respect to Counts I and IV (in part).


June 15, 2012                                                          /s/
Date                                                        J. Frederick Motz
                                                            United States District Judge